## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| VICTOR COFFIN, an individual, and | ) | |
| VICTOR COFFIN, as Personal | ) | |
| Representative of the Estate of | ) | |
| LINDA COFFIN, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:18-cv-472-NT |
| | ) | |
| AMETEK, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiff Victor Coffin alleges that he was exposed to asbestos and that as a result he developed malignant mesothelioma. Since the commencement of this case, the Plaintiff has voluntarily dismissed or settled his claims against all Defendants except Defendant Maine Central Railroad ("**MCRR**"), for whom he worked for several years as a bridge operator at the Carlton Bridge. *See* ECF Nos. 32, 39, 65, 119. MCRR now moves for summary judgment on the one count remaining against it. (ECF No. 115).  For the reasons set forth below, the Defendant's motion is **DENIED**.

## BACKGROUND[1]

### I.   Asbestos Generally

"Asbestos is the name given to a group of naturally occurring minerals that are resistant to heat and corrosion." Occupational Safety & Health Admin., *Asbestos*

---

[1]       This background is drawn from the Defendant's Supporting Statement of Material Facts (ECF No. 116), the Plaintiff's Amended Opposing Statement of Material Facts (ECF No. 124), Defendant's

(ECF No. 121-9). Construction materials containing asbestos were commonly used in buildings constructed before 1970, and much of that material still remains in place. Pl.'s Resp. to Def.'s Requests to Strike ("**SOF**") ¶ 33 (ECF No. 127). Over time, more and more has become known about asbestos and its hazards. By 1930, asbestos was known to be a hazard and to cause asbestosis.[2] SOF ¶ 66. By 1949, the relationship between asbestos exposure and lung cancer was generally accepted, and by 1965, the knowledge that asbestos could cause mesothelioma was widespread, though uncertainties about asbestos hazards still remained. SOF ¶¶ 30, 66. So long as asbestos remains within the building material, it is not likely to be ingested into someone's lungs and does not pose an active risk. SOF ¶ 34.

## II. MCRR's Use of Asbestos-Containing Products

Between 1930 and 1982, MCRR used asbestos-containing products throughout the MCRR system, including asbestos roll, rolled asbestos, handhold gaskets (folded asbestos), asbestos "mud," handhold gasket (asbestos jacket), asbestos rope, asbestos mittens, asbestos pipe coverings, and asbestos transite board. SOF ¶ 51; *see also* SOF ¶ 53 ("MCRR carpenters were installing asbestos transite board on at least one bridge in the mid-1960s."). During that time, MCRR's carpenter crews cut asbestos-containing products with handsaws. SOF ¶ 55. As late as 1982, MCRR was

---

Reply Statement of Material Facts (ECF No. 125), and Plaintiff's Response to Defendant's Requests to Strike (ECF No. 127) (collectively "**SOF**"). Additional facts are drawn directly from the Local Rule 56(h) Record (ECF Nos. 113-1 to 113-11) and the Supplement Local Rule 56(h) Record (ECF Nos. 121-1 to 121-14 and 123) (collectively the "**Record**").

[2]    MCRR denies paragraph 66, citing to its own statement of fact at paragraph 30. SOF ¶ 66. But paragraphs 30 and 66 are not in conflict. Paragraph 30 merely states that Mr. Coffin's expert "acknowledges that as of 1972 there was [sic] 'lots of uncertainties' around guidance to employers about asbestos exposure in the workplace." SOF ¶ 30.

purchasing asbestos in 100-foot-long rolls. SOF ¶ 52. However, that same year, MCRR discontinued use of asbestos-containing products and began a program of asbestos removal. SOF ¶¶ 23, 54. In 1984, MCRR began to monitor levels and amounts of asbestos materials in its facilities during its asbestos removal. SOF ¶ 56. Despite these efforts, asbestos-containing products continued to exist at its facilities, including the Carlton Bridge. SOF ¶¶ 16, 39.

Evidence in the Record suggests that railroads, including MCRR, were aware of hazards associated with the inhalation of asbestos dust decades ago.[3] In 1937, E.S. French, President of MCRR and the Boston & Maine Railroad, was a member of the Board of Directors of the Association of American Railroads ("**AAR**").[4] SOF ¶ 35. At that time, members of the AAR were aware that asbestos was one of three "principal substances generating toxic dusts to which railway employe[e]s may be exposed" and that asbestosis is "strictly" a dust disease only contracted by breathing asbestos dust. SOF ¶ 36; Med. & Surgical Section, Proceedings of the Seventeenth Annual Meeting

---

[3]     Mr. Coffin did state at his deposition that he was not aware of any information that MCRR had any knowledge of the hazards of asbestos at the time of his employment. SOF ¶ 17. The parties quibble over the details of this factual statement, *see* SOF ¶ 17, but I find that there is other evidence in the Record that MCRR knew about—or likely should have known about—the general hazards of asbestos at that time, *see* SOF ¶¶ 35–36. Neither party convincingly explains the relevancy of Mr. Coffin's awareness of MCRR's knowledge at that time.

[4]     MCRR requests to strike paragraphs 35 through 39, stating that it "objects to [these] statement[s] because [they are] not supported by . . . valid record citation[s], lack[] foundation, and [are] hearsay." SOF ¶¶ 35–39. However, the Plaintiff provides a citation to the supplemental record for each of these paragraphs and provides authority to support inclusion of them. *See* Local Rule 56(h) Pre-filing Conference Report & Order 2 (ECF No. 112) ("If during the motion practice any party determines that they need to supplement the record, they may file a supplemental record . . . ."). MCRR, on the other hand, offers no authority or citation to support its position that the statements should be stricken or to support its denial of the statements. Thus, the requests to strike are denied, and I have considered the statements admitted for the purposes of this motion. *See* D. Me. Loc. R. 56(c), (f).

3

of the Ass'n of Am. R.Rs. 20, 22 (June 7–8, 1937) ("**1937 AAR Proceedings**"), Record #2724–25 (ECF No. 121-1). Moreover, in 1937, members of the AAR were informed of methods to protect their employees from asbestos dust by means of "ventilating systems," "[s]ubstituting non-poisonous materials for those known to be poisonous," "protective equipment furnished [to] the individual employe[e]," and simple "good housekeeping." SOF ¶ 36; 1937 AAR Proceedings 21–22, Record #2724–25.

Despite these facts, MCRR did not have a medical program before 1977, did not communicate the hazards of asbestos to its employees before 1982, and did not employ an industrial hygienist until 1985. SOF ¶¶ 57–59. The first claims of any nature filed by employees against MCRR that alleged asbestos-related injuries were four actions commenced on January 8, 1985. SOF ¶ 24. Up until that point, MCRR did not know if workers exposed to asbestos had a statistically higher risk of contracting mesothelioma. SOF ¶ 60. Moreover, at that time, MCRR did not acknowledge the causal link between the inhalation of asbestos fibers or dust and the diseases of asbestosis, lung cancer, and mesothelioma. SOF ¶ 62.

## III.    Mr. Coffin's Alleged Exposure to Asbestos at the Carlton Bridge

The Carlton Bridge, which spans the Kennebec River between Bath and Woolwich, was built under the supervision of the Maine Department of Transportation ("**MDOT**") and was completed in 1929. Dep. of Victor Coffin Vol. I, Sept. 17, 2018, 87:10–13, Record #1425 (ECF No. 113-1); Def.'s Answers to Interrogatories Directed to Def. MCRR by Pl. 2, Record #2611 (ECF No. 113-9). From 1926 until 1986, MCRR had an interest in the Carlton Bridge, whether as a joint owner, lessee, or otherwise, including a 50-year period during which MCRR operated

4

and maintained the bridge. SOF ¶¶ 1, 49; *see also* SOF ¶ 8 (stating MDOT took over operation of the bridge in 1987). For most of Mr. Coffin's employment with MCRR, MCRR was 100 percent responsible for the maintenance of the bridge's railroad track structure, lift span machinery, signaling, and bridge operators. SOF ¶ 50. MCRR is unaware of any modifications or changes made to the original construction of the control room.[5] SOF ¶ 1.

In the summer of 1967, Mr. Coffin began working for MCRR as an Assistant Drawbridge Operator in the Signal Department at the Carlton Bridge. SOF ¶ 2. He served in that position for six months before joining the Navy in December of 1967, SOF ¶ 2, and his duties included keeping the engine room, operating room, and battery room clean at all times, SOF ¶ 37.

After returning from the Navy in 1971, Mr. Coffin went back to work for MCRR. SOF ¶¶ 3–4. For the first four to six weeks, he worked at the Waterville Shops in Waterville, Maine, doing electrical work in the facility, including installing fluorescent lighting; running conduit and installing wiring for a Coke machine; climbing poles; and replacing outside lighting. SOF ¶ 3. Mr. Coffin then returned to the Carlton Bridge in late 1971 and worked at the bridge until 1987, with periods of furlough for three to four months each winter. SOF ¶¶ 4–5. Mr. Coffin worked as an operator of the bridge and spent approximately 85–90 percent of his time in the

---

[5]      In paragraph 1, MCRR asserts that it "made no modifications or changes to the original construction of the control room." SOF ¶ 1. Mr. Coffin denies this statement and requests to strike it. A review of the Record shows that the more precise statement is that MCRR "is unaware" of any such modifications or changes. Def.'s Answers to Interrogatories Directed to Def. MCRR by Pl. 2, Record #2611 (ECF No. 113-9).

control room.[6] SOF ¶¶ 6, 65. He spent the remainder of his time in the machine shop and the engine room. SOF ¶ 65. Mr. Coffin's job involved routine maintenance and operation of the bridge, which included greasing, maintenance of the equipment, and cleaning. SOF ¶ 7. Generally speaking, he spent the majority of his time during this timeframe in the control room watching ship traffic and raising and lowering the bridge. SOF ¶ 7. In September of 1987, when MDOT took over operation of the Carlton Bridge, it made Mr. Coffin the Chief Bridge Operator. SOF ¶ 8.

It is undisputed that asbestos-containing products were present at the Carlton Bridge. SOF ¶¶ 38–39. As of 2000, MDOT specified the removal of asbestos in the "control house" and "storage shed" of the Carlton Bridge, as well as "transite panels and floor boards, sheathing and insulation" in its "machinery house." SOF ¶ 38. In 2001, New Meadows Abatement, Inc., removed thirteen cubic yards (351 cubic feet) of friable and non-friable asbestos from the Carlton Bridge. SOF ¶ 39. However, the parties dispute whether Mr. Coffin was exposed to asbestos at the bridge and, as the focus of this motion, whether such exposure was foreseeable.

Mr. Coffin claims that he was exposed to asbestos contained in the walls of the control room, engine room, machine shop, and operating room of the drawbridge. SOF ¶ 9. The control room was made up of individual panels with a one-inch strip of trim covering each of the seams. SOF ¶ 10. This type of construction is consistent with the

---

[6]      MCRR denies and requests to strike paragraph 65, arguing that Mr. Coffin "failed to cite to the record" and instead "has identified records from another matter [in] which [MCRR] was not involved." SOF ¶ 65. This request to strike is denied because Mr. Coffin has cited to a document in the Record and MCRR has given no reason why this prior testimony cannot be considered for summary judgment purposes.

typical use of cement wall panels, even to this day, where control joints (sometimes referred to as expansion joints) are used to account for potential expansion under various weather conditions and possible vibration and thereby avoid physical damage to the rigid panels. SOF ¶ 11; *see also* SOF ¶ 15 (stating that asbestos-containing board "was common in building material used for decades"). The walls of the Carlton Bridge control room were smooth and had been painted several times. SOF ¶¶ 10, 13. MCRR avers that the maintenance of the physical integrity of the various rooms of the Carlton Bridge demonstrates that the control joints were effective in achieving their intended purpose. SOF ¶ 12; *see also* SOF ¶ 15 (MCRR stating that, due to the "immobilization and encapsulation of fibers," asbestos-containing board "was not, and still is not, considered to pose a health risk except when it is cut or demolished").

Mr. Coffin disputes this point.[7] SOF ¶ 12. He recounts that the Carlton Bridge would "violently" shake when trains passed over it. SOF ¶ 46. Even the passage of

---

[7]    MCRR requests to strike Mr. Coffin's response to paragraph 12, asserting that he "attempts to create a controversy of fact where there is none" and cites to material outside the Record. SOF ¶ 12; *see also* SOF ¶ 48. Mr. Coffin's response cites to testimony he gave in a proceeding before the Maine Workers' Compensation Board, two days after he was deposed by MCRR. MCRR argues that Mr. Coffin cannot rely on the later testimony when it is contrary to clear answers he gave to unambiguous questions in discovery. SOF ¶ 12 (citing *Escribano-Reyes v. Pro. Hepa Certificate Corp.*, 817 F.3d 380, 386 (1st Cir. 2016)). In *Escribano-Reyes*, the First Circuit held that the district court did not abuse its discretion in striking a sworn statement by the plaintiff that was inconsistent with prior statements and was signed after the defendant moved for summary judgment. 817 F.3d at 386–87. The First Circuit described the stricken statement as an "eleventh-hour filing" and stated that the plaintiff offered "no satisfactory explanation for the inconsistencies." *Id.* at 387. Here, Mr. Coffin testified before the Workers' Compensation Board weeks before he filed this case and more than two years before MCRR moved for summary judgment. Thus, this subsequent testimony does not appear to be an effort to "mov[e] [the] target." *See Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54–55 (1st Cir. 2000). And, as Mr. Coffin points out, the initial response stating that he saw no dust was made towards the end of two days of questioning, raising the possibility that his answers were the "product of fatigue or a 'lapse of memory.' " SOF ¶ 48; *see also Hernandez-Loring*, 233 F.3d at 54–55 (explaining that satisfactory explanations can include lapses in memory and new information and can depend on the district court's assessment of specific facts). I also note that, even in the earlier deposition, Mr. Coffin recalled having to clean up visible dust when a section of wall board was replaced in the maintenance shop at the bridge. Dep. of Victor Coffin Vol. II, Sept. 18, 2018, 330:21–22, 331:04–05,

heavy trucks made the bridge shake. SOF ¶ 46. Mr. Coffin recalls working at the bridge during "a couple of hurricanes" when "everything just rocked and rolled and shook." SOF ¶ 46. According to Mr. Coffin, when the bridge shook, the asbestos wall panels of the control room rubbed together.[8] SOF ¶ 47. Mr. Coffin has given conflicting testimony on whether he saw visible dust when the wall panels shook and rubbed together. In one instance, Mr. Coffin testified that he saw such dust on the seams between the wall panels, could see dust in the air, and had the responsibility of sweeping dust from the floors. SOF ¶ 48. In another, Mr. Coffin indicated that he never saw dust emanate from the movement of the panels. SOF ¶ 12. Although Mr. Coffin did not become aware that there was asbestos in the control room or other walls at the Carlton Bridge until after MDOT took over operation of the bridge and he no longer worked there, he now has "no doubt" that he was exposed to asbestos dust while he was in the operating room as the bridge shook. SOF ¶¶ 19, 47; *see also* SOF ¶ 18[9] (noting that Mr. Coffin stated that, while working at the bridge, he had no

---

Record #1697–98 (ECF No. 113-2). Thus, for purposes of this motion, I will consider Mr. Coffin's testimony from the Workers' Compensation Board proceeding, and MCRR's request to strike Mr. Coffin's response to paragraph 12 and request to strike paragraph 48 are denied. Any conflict in testimony can be assessed by the jury at trial.

[8]     MCRR denies this statement, arguing that it "is not supported by the record citation." SOF ¶ 47. However, at the cited portion of Mr. Coffin's deposition, Mr. Coffin states that, when the bridge shook, "you could just see [the wall panels] moving . . . [a]nd then I'm thinking, wow, that stuff rubbing together." Dep. of Victor Coffin Vol. II, Sept. 18, 2018, 356:01–9, Record #1723. Although this testimony is not perfectly clear, it provides enough support for the Plaintiff's statement of fact.

[9]     MCRR requests to strike Mr. Coffin's response to this paragraph, asserting that it "fail[s] to effectively controvert" the statement of fact. SOF ¶ 18. Although Mr. Coffin's response could be construed more as a qualification than a denial, this request to strike is denied because the response is supported by the Record.

concerns about asbestos exposure). Mr. Coffin is not aware if any of his MCRR coworkers contracted mesothelioma. SOF ¶ 20.

MCRR maintains that it was never aware of the existence of asbestos at the Carlton Bridge during the period that it operated and maintained the bridge. SOF ¶ 16. To bolster this point, MCRR points to a January 1984 inspection of the bridge by representatives from MDOT, MCRR, and the Bureau of Labor Standards. SOF ¶ 21. The inspection found very few items of concern at the bridge. SOF ¶ 22. Within the "Operator's Room," the inspectors noted an electrical panel with exposed electrical connections, but the inspection memorandum did not note any damage or deterioration of the internal wall panels or mention the possibility of potential exposure to asbestos for occupants. SOF ¶ 22. MCRR states that it only became aware that asbestos products were present in the control room when independent contractors, hired by MDOT, made such a determination in approximately 2000. SOF ¶ 16.

## IV.      Procedural Background

Mr. Coffin filed suit in November 2018, bringing six claims against several defendants. Compl. (ECF No. 1). The only remaining defendant is MCRR, and Mr. Coffin's only remaining claim arises under the Federal Employers' Liability Act ("**FELA**"). As part of that claim, Mr. Coffin asserts that MCRR failed to provide him with a reasonably safe place to work, conduct any testing for asbestos in his work area, warn him of the dangers posed by inhaling asbestos, or provide him with sufficient safety apparel and equipment. Compl. ¶ 39.

9

MCRR moved for summary judgment on October 30, 2020, asserting that Mr. Coffin cannot prove that it was foreseeable to MCRR that Mr. Coffin would be exposed to harmful levels of asbestos during his employment at the Carlton Bridge. Def. MCRR's Mot. Summ. J. ("**Def.'s Mot.**") 7–9 (ECF No. 115). Even if it could have known that the bridge walls contained asbestos, MCRR argues that, under the industrial standards of the time, MCRR had no reason to believe that there would be harmful exposures to him at the bridge, noting that no similar injuries have been reported in the scientific literature. Def.'s Mot. 10–11.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a rational factfinder could resolve it in favor of either party, *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020), and a fact is " 'material' if its existence or nonexistence has the potential to change the outcome of the suit," *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). The party moving for summary judgment bears the initial burden of showing that no such genuine dispute exists. *Feliciano-Muñoz*, 970 F.3d at 62. Once it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in his favor" with respect to each issue on which he bears the burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). In considering a motion for summary

10

judgment, I must construe the record in the light most favorable to the nonmovant, drawing all reasonable inferences in his favor. *Robinson v. Town of Marshfield*, 950 F.3d 21, 24 (1st Cir. 2020). But I need not credit "conclusory allegations, improbable inferences, and unsupported speculation." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92–93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)).

FELA creates a cause of action for railroad employees who are injured while at work due in any part to "the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence in [its equipment]." 45 U.S.C. § 51. Under FELA, a railroad owes its "employees a nondelegable duty to use reasonable care in furnishing them with a safe place to work." *Dykes v. BNSF Ry. Co.*, 356 F. Supp. 3d 1097, 1100 (W.D. Wash. 2018) (citing *Shenker v. Baltimore & O. R. Co.*, 374 U.S. 1, 7 (1963)). FELA has been characterized as "a broad remedial statute" and "has generally been given a liberal construction." *Huff v. Mass. Bay Commuter R.R. Co.*, Case No. 18-cv-10623-DJC, 2019 WL 5394174, at *3 (D. Mass. Oct. 22, 2019) (citing *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 6 (1st Cir. 1987)). But, because FELA does not impose strict liability, a plaintiff must still "prove the traditional common law elements of negligence—duty, breach, damages, causation, and foreseeability." *Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 598 (1st Cir. 1996); *see also Borger v. CSX Transp., Inc.*, 571 F.3d 559, 563 (6th Cir. 2009).

Courts have repeatedly emphasized that FELA's purpose cautions against removing a FELA case from the jury except in the rarest of circumstances. *See Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 509 (1957) ("Cognizant of the duty to effectuate the intention of the Congress to secure the right to a jury determination, this Court is vigilant to exercise its power of review in any case where it appears that the litigants have been improperly deprived of that determination."). The Third Circuit has held that a "trial court is justified in withdrawing . . . issue[s] from the jury's consideration only in those extremely rare instances where there is a *zero probability* either of employer negligence or that any such negligence contributed to the injury of an employee." *Hines v. Consol. R.R. Corp.*, 926 F.2d 262, 268 (3d Cir. 1991) (alterations in original) (emphasis added) (quoting *Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697, 699–700 (3d Cir. 1970)). Other courts have stated that "awarding summary judgment to the defendant railroad is appropriate 'only when there is *a complete absence of probative facts*' to support a jury verdict in the plaintiff's favor." *Gray v. Ala. Great S. R.R. Co.*, 960 F.3d 212, 216 (5th Cir. 2020) (emphasis added) (citing *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)); *see also Standard v. Union Pac. R.R. Co.*, No. 98-7134, 1999 WL 992973, at *2–3 (10th Cir. 1999) (applying "complete absence of probative facts" standard and reversing summary judgment for defendant); *Lager v. Chi. Nw. Transp. Co.*, 122 F.3d 523, 524–25 (8th Cir. 1997) (applying "complete absence of probative facts" standard in summary judgment context but finding plaintiff failed to meet that low burden). Courts in the Second Circuit have held that a FELA case should not be dismissed at the summary

judgment phase "unless there is *absolutely no reasonable basis* for a jury to find for the plaintiff." *Monington v. CSX Transp., Inc.*, No. 1:10-cv-1553 GLS/RFT, 2012 WL 716285, at *3 (N.D.N.Y. Mar. 6, 2012) (emphasis added) (quoting *Gadsden v. Port Auth. Trans–Hudson Corp.*, 140 F.3d 207, 209 (2d Cir. 1998)); *see also Smith v. Consol. Rail Corp.*, No. 95–3727, 1996 WL 366283, at *3 (6th Cir. 1996) ("If the plaintiff presents no evidence whatsoever to support the inference of negligence, the railroad's summary judgment motion is properly granted.").

Although the First Circuit has not specified which standard it applies, it too has recognized the "low threshold for proving fault on the employer's part (and, thus, a low threshold for liability)" under FELA. *Butynski v. Springfield Terminal Ry. Co.*, 592 F.3d 272, 276 (1st Cir. 2010). Moreover, at least one district court in the First Circuit has applied the "absolutely no reasonable basis" standard at the summary judgment stage. *See Meachen v. Iowa Pac. Holdings, LLC*, Civil No. 13-CV-11359-LTS, 2016 WL 7826660, at *3 (D. Mass. Feb. 10, 2016) (applying standard in assessing plaintiff's showing of foreseeability).

## DISCUSSION

In its motion for summary judgment, MCRR only asserts that Mr. Coffin has failed to establish the foreseeability element of his FELA claim. The Supreme Court has emphasized that "[r]easonable foreseeability of harm . . . is indeed an essential ingredient of FELA negligence." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011) (internal quotations omitted and emphasis deleted). As such, "if a person has no reasonable ground to anticipate that a particular condition would or might result

in a mishap and injury, then the party is not required to do anything to correct the condition." *Id.* (internal quotations omitted). But if negligence is proved "and is shown to have played any part, even the slightest, in producing the injury, then the carrier is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable." *Id.* at 703–04 (emphasis deleted) (internal quotations and citation omitted); *see also Abernathy v. E. Ill. R.R. Co.*, 940 F.3d 982, 989–90 (7th Cir. 2019). As with other elements of a FELA claim, an employer's "knowledge, actual or constructive, of the alleged inadequacies of the [employer's] equipment [is] a jury question." *Urie v. Thompson*, 337 U.S. 163, 178 (1949); *see also Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 853–54 (8th Cir. 2016) (per curiam) (emphasizing that foreseeability is a factual question rather than a legal one).

MCRR advances several arguments as to why it was not foreseeable that Mr. Coffin would be exposed to harmful levels of asbestos at the Carlton Bridge: (1) MCRR emphasizes that it was not aware that there was asbestos within the wallboards of the Carlton Bridge until years after Mr. Coffin's employment with MCRR ended; (2) MCRR asserts that the condition of the wallboards at the bridge gave MCRR no reason to believe that asbestos dust would escape encapsulation at any harmful levels; and (3) MCRR states that, based on the industrial standards and understanding of asbestos at the time, MCRR had no reason to believe that any exposure experienced by Mr. Coffin would be harmful.

## I. Knowledge about Presence of Asbestos at Carlton Bridge

MCRR argues that it could not have foreseen that Mr. Coffin would be exposed to asbestos because it was "not aware that there was asbestos in the wallboards of

the rooms on the Carlton Bridge during the time that it operated and maintained the bridge" and did not become aware of this fact until approximately 2000. Def.'s Mot. 4. MCRR also asserts that it "did not construct Plaintiff's workspace," "was merely a tenant of [MDOT]," and had no "notice of the use of asbestos in the construction or the alleged dangerous condition of the encapsulated wall panels." Def.'s Mot. 7. In the same vein, MCRR asserts that Mr. Coffin has not presented any evidence that it had greater awareness about the presence of asbestos in the walls than he did. Def.'s Mot. 7.

It is certainly possible that MCRR did not have actual notice that asbestos was present in the control room while Mr. Coffin was employed there, particularly because it did not build the bridge. *See* SOF ¶ 16. But the problem with MCRR's argument is that constructive notice of the harmful circumstances—not just actual notice—can support a FELA claim. *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 911 (7th Cir. 2020) ("The plaintiff must show that the employer had actual or constructive notice of those harmful circumstances." (internal quotations omitted)). Constructive notice asks what was *reasonably* foreseeable, a factual question that is typically answered by the factfinder at trial. *See Huff*, 2019 WL 5394174, at *3 ("Liability attaches under FELA where a defendant railroad 'knew, or by the exercise of due care should have known, that prevalent standards of conduct were inadequate to protect petitioner and similarly situated employees.' " (quoting *Urie*, 337 U.S. at 178)); *see also McIsaac v. CSX Transp., Inc.*, Civil Action No. 11–11455–RGS, 2012 WL 5354564, at *2 & n.3 (D. Mass. Oct. 30, 2012) (explaining that the defendant did not need to have actual

notice that plank was loose because "the element of foreseeability is satisfied if [the defendant] had notice (or reason to know) of the deterioration of the trestle and if the unsecured plank was within the realm of the risk presented by that deterioration").

For constructive notice, Mr. Coffin has offered the minimal evidence necessary to clear FELA's low hurdle. The undisputed facts show that there was asbestos present at the Carlton Bridge.[10] SOF ¶¶ 38–39 (stating that asbestos was removed from the Carlton Bridge, including from the "control house," in 2000 and 2001). The Record shows that asbestos-containing products were widely used in construction during the time period when the Carlton Bridge was built. SOF ¶ 33. Moreover, between 1930 and 1982, MCRR used asbestos products throughout its system, and in the last few years of Mr. Coffin's employment with it, MCRR began a program of asbestos removal. SOF ¶¶ 51–54. And finally, as discussed below, it is possible that asbestos dust was visible in the control room, suggesting that reasonable inspection or monitoring would have uncovered the hazardous conditions.[11] Based on this

---

[10]     MCRR critiques Mr. Coffin for failing to "indicate where the asbestos was found in the bridge, what the product was, or how it relates to Mr. Coffin's potential exposure." Reply Mem. in Support of MCRR's Mot. Summ. J. 6 (ECF No. 126). But the lack of these details does not doom Mr. Coffin's case on the element of foreseeability, particularly given FELA's low bar. Rather, they speak more to the elements of breach and causation.

[11]     Moreover, in assessing whether an injury was foreseeable, courts have considered whether the defendant could have discovered the hazardous condition by exercising due care. *See Peyton v. St. Louis Sw. Ry. Co.*, 962 F.2d 832, 833–34 (8th Cir. 1992) (affirming judgment for defendant notwithstanding jury verdict because plaintiff presented no evidence that defective wrench could have been discovered with due care and defendant's expert testified that defect was undiscoverable); *see also Huff v. Mass. Bay Commuter R.R. Co.*, Case No. 18-cv-10623-DJC, 2019 WL 5394174, at *3 (D. Mass. Oct. 22, 2019); *Ditton v. BNSF Ry. Co.*, No. CV 12-6932 JGB (JCGx), 2013 WL 2241766, at *15–16 (C.D. Cal. May 21, 2013) (stating that it should be "left for a jury to decide" whether defendant had constructive notice of defective hand brake because the defect could have been discovered through proper inspection). Given the presence of asbestos in MCRR's system and the dust alleged to have escaped from the control room walls, it is possible that MCRR could have taken additional steps to assess the potential hazards, perhaps by employing an industrial hygienist at an earlier point. *See*

record, it does not seem entirely unforeseeable that there would be asbestos-containing products in the control room of the Carlton Bridge.

MCRR cites two cases in which the First Circuit held that summary judgment was appropriate because the plaintiffs had failed to show that the defendants had actual or constructive notice of a risk of injury to the plaintiffs. *See* Def.'s Mot. 5, 8 (citing *Moody v. Bos. & Me. Corp.*, 921 F.2d 1, 3 (1st Cir. 1990) and *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 7 (1st Cir. 1987)). Both cases are readily distinguishable because they involved employees who suffered heart attacks and who had given their employers no reason to be concerned about their physical health.[12] In *Moody*, for example, the First Circuit noted that there was no evidence that the employer had been informed about or had reason to know about the employee's deteriorating physical condition and increased stress. 921 F.2d at 3. A critical piece of information regarding the injury was held by the employee, not the employer—in other words, the employee was in the better position to foresee the injury. *See id.*; *see also Robert*, 832 F.2d at 6–7 (explaining narrow standard for finding liability in FELA cases involving heart attacks and holding that employer could not foresee employee would suffer

---

SOF ¶ 59 (stating that MCRR did not employ an industrial hygienist before 1985). The reasonableness of its actions, however, is a question for the jury.

[12]    Elsewhere in its motion, MCRR cites a handful of cases in which courts found no foreseeability. Def. MCRR's Mot. Summ. J. 6–7 (ECF No. 115). These cases are also distinguishable. For example, in *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 744–45 (7th Cir. 2005), the Seventh Circuit affirmed summary judgment for the defendant railroad, finding that the plaintiff had presented no evidence that the defendant had actual or constructive notice of a greasy substance on a ladder that caused the plaintiff's fall. But, in that case, the court noted the plaintiff had presented no evidence that an earlier inspection would have uncovered the presence of the greasy substance, adding that the source and timing of the substance was unknown. *Holbrook*, 414 F.3d at 744–45. This is distinguishable from Mr. Coffin's case, in which ongoing exposure from an unmodified asbestos-containing product is alleged.

heart attack after on-the-job harassment). This is different from Mr. Coffin's injury, which allegedly stems from the conditions of his workspace and involves exposure to a substance widely known to be harmful.[13] There is no suggestion that Mr. Coffin's own physical health—unknowable to MCRR without divulgence—contributed to his injury.

Because there is some reasonable basis to conclude that MCRR should have known about the presence of asbestos at the Carlton Bridge, the question of foreseeability should be left to the jury.[14] *See Hines*, 926 F.2d at 268; *Cook v. CSX Transp., Inc.*, 557 F. Supp. 2d 1367, 1373 (M.D. Fla. 2008) ("An employer's 'knowledge, actual or constructive, of the alleged inadequacies of the [employer's] equipment [is] a jury question.' " (alterations in original) (quoting *Urie*, 337 U.S. at 178)).

---

[13]    Despite MCRR's suggestion otherwise, Mr. Coffin's own lack of knowledge about the presence of asbestos is far from determinative. What was reasonably foreseeable to MCRR, as the employer, would likely differ from what was reasonably foreseeable to Mr. Coffin and other employees.

       For similar reasons, MCRR's point about its status as lessee—rather than owner or builder—of the Carlton Bridge appears aimed at disputing actual notice of the presence of asbestos. Because Mr. Coffin can attempt to prove constructive notice at trial, this status is not determinative. At the same time, I note that lack of ownership of the workspace does not absolve a railroad of a duty to ensure that the workspace is safe, which includes a duty to inspect the property of third parties for hazards and to take precautions to protect employees from possible defects. *See Dykes v. BNSF Ry. Co.*, 356 F. Supp. 3d 1097, 1100 (W.D. Wash. 2018) (collecting cases holding that railroads had duty to inspect property of third parties when it leased the property or sent its employees there).

[14]    It is possible that MCRR would not have had reason to know of the asbestos because a reasonable inspection would not have uncovered it. But MCRR develops no such argument. For example, although an inspection was conducted in 1984 to "determine what safety and health problems might exist" at the Carlton Bridge, the scope of that inspection—and whether inspectors looked for asbestos dust—is not clear from the Record. SOF ¶¶ 21–22; Inter-Departmental Mem. (ECF No. 113-11).

## II.     Foreseeability that Mr. Coffin Would Be Exposed to Asbestos

The second thrust of MCRR's argument is that there was no reason to anticipate that asbestos dust would escape the walls of the Carlton Bridge and harm Mr. Coffin. The parties agree with the general principle that, as long as asbestos in building material stays in place, it is not likely to be ingested or cause harm. SOF ¶ 34. Drawing from this fact, MCRR states that there was "nothing about the condition of the control room during Mr. Coffin's employment that would trigger a cause for concern," adding that there "is no evidence that the asbestos was not 'in place.' " Def.'s Mot. 8; *see also* Reply Mem. in Support of MCRR's Mot. Summ. J. ("**Def.'s Reply**") 5–6 (ECF No. 126) (explaining that, because the asbestos was "presumed to be encapsulated in place behind many layers of paint," MCRR had no reason to be concerned about potential exposure). MCRR rests at least part of its argument on the purported fact that "Mr. Coffin observed no dust from the walls and did not have to clean the control room as a result of the vibrations he reported." Def.'s Mot. 8.

It is possible that Mr. Coffin's exposure was unforeseeable if there is no evidence that asbestos dust was escaping the control room walls. But this fact remains in dispute. *See* supra note 7 (concluding that MCRR has not persuasively explained why the Court should strike Mr. Coffin's testimony before the Workers' Compensation Board that he saw dust). As noted above, Mr. Coffin cites testimony in which he states that he did see dust appear when the walls of the bridge shook, while MCRR cites testimony in which Mr. Coffin denies seeing any dust. SOF ¶¶ 12, 48. Because I have denied both parties' requests to strike the conflicting statements, a

factual dispute remains. *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 11 (1st Cir. 2019) ("Generally speaking, 'conflicting evidence' is the hallmark of an issue that calls for factfinding, not summary judgment."). And, given Mr. Coffin's testimony that dust did emanate from the walls when they shook, I cannot conclude that there is a complete absence of probative facts showing that MCRR reasonably should have known that Mr. Coffin would be exposed to asbestos dust.

## III.   Foreseeability of Harm Caused by Such Asbestos Exposure

Lastly, MCRR argues that it was unforeseeable that a person would have been injured by the type of exposure that Mr. Coffin allegedly had. MCRR emphasizes that "Mr. Coffin's employment was not typical of a railroad worker" and that "there are no case studies or exposure assessments specific to incidental exposure to workers within structures with wall boards containing asbestos, if the employees were not manufacturing or working with the product." Def.'s Reply 4–5. MCRR adds that, "[e]ven if MCRR had some general knowledge about the dangers of working directly with asbestos, there is no evidence to cause a reasonable person from 1967 to 1987 to believe that working in a room containing wall board with encapsulated asbestos posed any danger." Def.'s Reply 4. And, finally, MCRR contends that, even if Mr. Coffin was exposed to asbestos, his exposure levels would have been minimal and "the asbestos fiber type in in the cement wall boards was most likely chrysotile, which is generally considered to present a negligible risk for development of mesothelioma." Def.'s Mot. 9; *see also* SOF ¶¶ 27–29 (citing MCRR expert's opinion that Mr. Coffin's cumulative exposure would have been between 3,500 and 40,000 times lower than

the most stringent occupational exposure regulations at the time and 1,700 to 20,000 times lower than the most stringent exposure regulations today).[15]

There are several problems with these arguments. First, they rest upon the assumption that the asbestos was properly encapsulated, a fact that—as discussed above—remains in dispute. And MCRR's general statement that working in a room with encapsulated asbestos is not hazardous does not account for Mr. Coffin's testimony that the walls of *this* control room shook violently when concrete-laden trains passed over the bridge. *See* SOF ¶ 46.

Second, Mr. Coffin has offered evidence to dispute MCRR's assertion that the fiber type was "likely" chrysotile and that such fibers are harmless at the alleged exposure levels. *See* SOF ¶¶ 26, 41–42 (criticizing the foundation for MCRR's expert's statement that chrysotile was the fiber historically used in cement boards); SOF ¶ 45 (noting that, according to the Occupational Safety & Health Administration, there is no safe level of exposure for any type of asbestos fiber, and every occupational exposure contributes to the risk of getting an asbestos-related disease).[16] Moreover,

---

[15]    MCRR states that "the literature reflects that workers or residents in asbestos containing structures are not at risk of consequential exposure from routine activities." SOF ¶ 29. Mr. Coffin denies this point and requests to strike it, arguing that it is a statement of opinion rather than of fact and citing to his own statement of fact that there is no safe level of asbestos exposure. SOF ¶ 29 (citing SOF ¶ 45); *see also* SOF ¶¶ 27–28 (Plaintiff also denying and requesting to strike statements for same reason). For the purposes of this motion, I deny the request to strike because MCRR has supported the statements with citations to the Record.

[16]    MCRR denies paragraph 45, without citing any part of the record to dispute it, and requests to strike it "because it is not supported by a valid record citation, lacks foundation, lacks temporal relevance, and is hearsay." SOF ¶ 45. Paragraph 45 cites to a page on OSHA's website, which Mr. Coffin did include in his supplemental record. *See* Occupational Safety & Health Admin., *Asbestos* (ECF No. 121-9). MCRR does not develop its argument about why the document lacks foundation or temporal relevance or is hearsay. Any question about whether to credit the statements in the document or what weight to give them can be answered by the factfinder at trial.

21

even if the asbestos was *likely* chrysotile, that level of probability is not sufficient in a FELA case, where any probability of foreseeability or any probative facts supporting foreseeability can defeat summary judgment.

Finally, the lack of scientific studies and complaints from other employees is not conclusive as to the issue of foreseeability. *See Gallick v. Baltimore & Ohio Ry. Co.*, 372 U.S. 108, 121 (1963) (calling it "a far too narrow a concept of foreseeable harm" to conclude that the defendant "had no specific 'reason' for anticipating a mishap or injury to" the plaintiff just because there had been no prior similar incidents); *Ditton v. BNSF Ry. Co.*, No. CV 12-6932 JGB (JCGx), 2013 WL 2241766, at *15 (C.D. Cal. May 21, 2013) (absence of other reports of injuries or lack of prior complaints "do not establish as a matter of law that injury was not foreseeable"). This is especially so because a plaintiff can satisfy the foreseeability prong even if the extent of his injury was not foreseeable. *See McBride*, 564 U.S. at 703–04. Thus, if it was foreseeable that the asbestos exposure would cause "any type of mishap [or] injury," then the foreseeability element can be satisfied.[17] *See Abernathy*, 940 F.3d at 990 (noting that FELA does not require plaintiff to show that "the particular consequences of [the defendant's] negligence" was foreseeable but rather just

---

[17]     Although MCRR's argument—that no injuries similar to Mr. Coffin's have been reported in the scientific literature—does not defeat the foreseeability element, it will likely be relevant to the issues of causation and perhaps breach. It may have been foreseeable that asbestos exposure like Mr. Coffin's might cause some type of injury, but at the same time, Mr. Coffin might be unable to produce the scientific evidence to establish that the exposure actually played any part in his illness. Similarly, in assessing whether MCRR breached its duty, a jury will likely consider whether the steps MCRR took to prevent harmful exposure were reasonable based on existing scientific understanding.

"circumstances which a reasonable person would foresee as creating a potential for harm" (quoting *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996))).

Given MCRR's general knowledge of the harms of asbestos exposure, I cannot say that it was unforeseeable that the type of exposure that Mr. Coffin allegedly had would be harmful, even if the extent of his injury—in this case developing malignant mesothelioma—could not have been anticipated.

## CONCLUSION

In its motion for summary judgment, MCRR only attacks the foreseeability of Mr. Coffin's alleged injury—not whether MCRR breached its duty or whether that breach caused the injury. All MCRR asks me to rule on is whether the undisputed facts show that harm from asbestos exposure at the Carlton Bridge was unforeseeable. Because I must view the facts in the light most favorable to Mr. Coffin and given the "low threshold" imposed by FELA at summary judgment, I cannot conclude at this stage that it was unforeseeable that harmful asbestos exposure would or could occur in Mr. Coffin's workspaces at the bridge. *See Butynski*, 592 F.3d at 276; *Huff*, 2019 WL 5394174, at *3 (citing "low threshold" required by plaintiff to overcome motion for summary judgment and denying defendant's motion).

For the reasons stated above, the Court **DENIES** the Defendant's Motion for Summary Judgment (ECF No. 115).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 25th day of January, 2021.

23